UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

        Plaintiff,

v.

                                          Case No. 10-cr-20064

ERIC RODNEY REDDICK,                Honorable Julian Abele Cook, Jr.

        Defendant.


<u>ORDER</u>

        In this case, the Defendant, Eric Rodney Reddick, has urged the Court to consider and apply the Fair Sentencing Act of 2010, Pub. L. 111-220, 124 Stat. 2372 (Aug. 3, 2010) ("FSA"), to his case. The FSA, in relevant part, amended the sentencing provision that is applicable to the criminal offense to which Reddick pled guilty; namely, 21 U.S.C. § 841(b)(1)(B)(iii), and, in doing so, increased the amount of crack cocaine that is necessary to trigger a five-year mandatory minimum sentence of incarceration.

        In his sentencing memorandum, Reddick urges the Court to incorporate the FSA into his sentence which, if adopted, would not subject him to any mandatory minimum sentence under this statute. The Government opposes this proposal or any other suggestion that would bring about the application of the FSA to any criminal conduct that was committed prior to its adoption, even where - as here - the sentencing occurs after the enactment of this statute.

1

In the alternative, Reddick argues that he has met the conditions for the statutory "safety valve" provisions within 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2. Thus, it is his belief that he should be sentenced pursuant to the Sentencing Guidelines because the mandatory minimum sentence standard is not applicable to him. The Government rejects this argument, contending that Reddick has not satisfied an essential "safety valve" condition of fully and truthfully disclosing all pertinent information relating the criminal offense to federal agents.

## I.

Reddick was charged in a one-count indictment with being in possession of, with an intent to distribute, a controlled substance, in violation of 21 U.S.C. § 841(a). The indictment alleged that he possessed 11.99 grams of crack cocaine with an intent to distribute this illicit drug in February of 2009. On August 16, 2010, Reddick pled guilty pursuant to a written agreement with the Government, as authorized by Fed. R. Crim. P. 11. Although his guilty plea was accepted by the Court, the Rule 11 agreement was taken under advisement. The parties' written agreement acknowledged that they had a continuing disagreement over the appropriate guideline calculations. It was - and continues to be - Reddick's position that he is entitled to a two-level reduction because, in his opinion, the terms for the adoption of the "safety valve" were satisfied by him. Thus, he submits that the Court should limit his guideline range to 37-46 months. On the other hand, the Government, consistent with its position, asserts that Reddick's guideline - by eliminating the suggested two-level reduction - should be within the 46-57 month range. Furthermore, the Government also contends that the law imposes a statutory minimum of 60 months upon Reddick who, in its judgment, is not entitled to the "safety valve" or the provisions of the FSA.

## II.

The parties agree that on the date of the criminal offense to which Reddick pled guilty, he possessed a sufficient quantity of crack cocaine to trigger a five-year mandatory minimum under 21 U.S.C. § 841(b)(1)(B)(iii). At that time, the possession of five or more - but under fifty - grams of cocaine base triggered the imposition of a five-year minimum sentence, and the possession of fifty or more grams triggered the imposition of a ten-year minimum. The corresponding quantities necessary to trigger the mandatory minimum sentences for powder cocaine were one hundred times higher; namely, five hundred grams for a five-year minimum and five kilograms for a ten-year minimum. With the enactment of the FSA, this 100:1 powder-to-crack cocaine ratio was reduced to an 18:1 ratio. As a result, (1) the five-year minimum is now triggered by competent evidence that the accused possessed 28 grams of crack cocaine, and (2) the ten-year minimum is now triggered by competent evidence that the accused possessed 280 grams of crack cocaine. Thus, if the amended provisions of the FSA are applicable to Reddick in this case, his possession of 11.99 grams of crack cocaine would be insufficient to trigger any mandatory minimum.

The 100:1 ratio was created by the Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, 100 Stat. 3207 (1986) ("the 1986 Act"). Congress had treated crack cocaine more severely than powder cocaine based on the belief that the former was more dangerous and addictive than the latter. *See Kimbrough v. United States*, 552 U.S. 85, 95-96 (2007) ("Congress apparently believed that crack was significantly more dangerous than powder cocaine in that (1) crack was highly addictive; (2) crack users and dealers were more likely to be violent than users and dealers of other drugs; (3) crack was more harmful to users than powder, particularly for children who had been exposed by their mothers' drug use during pregnancy; (4) crack use was especially prevalent among teenagers; and (5) crack's potency and low cost were making it increasingly popular."). As a result of the

3

100:1 ratio, those defendants who were convicted of offenses involving crack cocaine received sentences three to six times longer than their counterparts whose offenses involved an equivalent quantity of powder cocaine. *Id.* at 94-95. However and over a period of time, this ratio came under increasing criticism from the courts, lawmakers, practitioners, and legal scholars, all of whom had criticized the basic assumptions under the 1986 Act. *See, e.g.*, *United States v. Santana*, No. 09-CR-1022, 2011 WL 260744, at *2 (S.D.N.Y. Jan. 20, 2011) (describing history of and response to 1986 Act). Moreover, the 1986 Act had also been criticized as producing significant racial disparities in sentencing. *See, e.g.*, *Kimbrough*, 552 U.S. at 97-100 (describing United States Sentencing Commission reports which called the 100:1 ratio into question due to (1) its disparate racial impact; (2) the inaccuracy of its underlying assumptions; and (3) its inconsistency with purported goal of the 1986 Act of punishing major drug traffickers more severely than low-level dealers because the former dealt in powder cocaine which was later converted into crack by the latter).

The FSA was passed in large part to address these concerns. *See* 156 Cong. Rec. S1680-81 (daily ed. Mar. 17, 2010) (statement of Sen. Richard Durbin) ("We have talked about the need to address the crack-powder disparity for too long. Every day that passes without taking action to solve this problem is another day that people are being sentenced under a law that virtually everyone agrees is unjust."). According to its preamble, the purpose of the FSA is to "restore fairness to Federal cocaine sentencing."

In addition to the quantity-based changes to the mandatory minimum provisions, the Congress, through its legislative enactment of the FSA, directed the Sentencing Commission in a section entitled "Emergency Authority for United States Sentencing Commission" to "make such conforming amendments to the Federal sentencing guidelines as the Commission determines

4

necessary to achieve consistency with other guideline provisions and applicable law." FSA § 8(2). In addition, it was also the directive of the Congress that this action was to occur "as soon as practicable, and in any event not later than 90 days after the date of enactment of this Act." *Id.* § 8(1). The FSA also increased the punishment that would be applicable to various offenses. For example, this statute increased fines for trafficking offenses, *id.* § 4, and directed the Sentencing Commission to amend its Guidelines to incorporate certain sentencing enhancements, *id.* §§ 5-6.

III.

The FSA is silent with respect to retroactivity. However, federal law precludes a defendant in a criminal matter from being relieved of any statutory penalty that was in place when the alleged offense was committed if the enactment of a later statute has the effect of reducing or eliminating the original penalty - unless the repealing act "expressly provide[s]" otherwise. 1 U.S.C. § 109. This statute (i.e., §109 - known as the "Saving Statute") provides as follows:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.[1]

The words "penalty," "forfeiture," and "liability" have been construed by the Supreme Court as having applicability not only to the offense but also to the resulting punishment for its violation. *United States v. Reisinger*, 128 U.S. 398 (1888). Thus, in those situations where the Saving Statute is applicable, it saves sentencing provisions as well as substantive laws, *see Santana*, 2011 WL 260744, at *9 (citing *United States v. Smith*, 354 F.3d 171, 175 (2d Cir. 2003)), and "bar[s]

---

[1] The Saving Statute has been applied in civil as well as criminal cases. *See White v. Cent. Vt. Pub. Serv. Corp.*, 958 F. Supp. 174, 179-80 (D. Vt. 1996) (listing cases). However, the Court will discuss its application only in connection with criminal issues.

5

application of ameliorative criminal sentencing laws repealing harsher ones in force at the time of the commission of an offense," *Warden v. Marrero*, 417 U.S. 653, 661 (1974). While some state saving statutes include provisions that exempt statutes which reduce punishment, the federal version does not. *Santana*, 2011 WL 260744, at *8-9 (describing variant state statutes, and distinguishing federal version). Therefore, it has been held that the Saving Statute does not permit a court to apply ameliorative sentencing provisions to those defendants who were sentenced after those provisions were passed if the underlying conduct occurred prior to the enactment of the statute. *See Santana*, 2011 WL 260744, at *9-10 (listing cases from various circuits applying Saving Statute to ameliorative criminal sentencing laws). Therefore, it is clear that, if the Saving Statute is thought to be applicable to the FSA in the circumstances presented here, Reddick must be sentenced according to the law as it existed on the date of his offense.

Reddick neither argues, nor - given the text of the FSA - could he argue, that this legislative enactment expressly provides for its retroactive application. (*See* Def.'s Br. at 6 (acknowledging that "there is not a retroactivity provision written specifically into the new law")). Rather, he advances four arguments as to why an exception to the Saving Statute should be adopted by the Court as it relates to him in this criminal action.

First, Reddick asserts that the FSA did not release or extinguish a penalty. Rather, he argues that the FSA simply redefines the words "serious" and "major" traffickers by changing the quantities of crack associated with each class of accused persons. Second, he submits that the FSA does not bring about any change in substantive law. Instead, he is of the opinion that the FSA produces only remedial or procedural modifications of the law. Third, he posits that the reasonable expectations

of the parties require that the FSA be applied to all sentences imposed after its enactment. Fourth, it is his position that Congress intended the FSA to apply to all non-final cases.

## A.

An examination of Reddick's first argument (to wit, the FSA effected a redefinition but not a release from a penalty) demonstrates that it cannot withstand scrutiny. Despite not providing the Court with any statute or case law with which to support his position, it appears that Reddick - like some other defendants who have proffered similar arguments in favor of the application of the FSA - apparently relies upon *United States v. Kolter*, 849 F.2d 541, 544 (11th Cir. 1988), for the proposition that a mere redefinition does not trigger the Saving Statute. In *Kolter*, the defendant was charged with the illegal possession of a firearm by a felon. However, after the offense was committed, but before Kolter was tried, Congress redefined the term "convicted felon." Prior to that enactment, in 1983, the Supreme Court had held in *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 111-12 (1983), that the term "convicted felon" was to be defined according to federal law. However, Congress rejected this rationale of *Dickerson*, and, in so doing, concluded that the term should be defined according to the law of the jurisdiction in which the proceedings were held. *Kolter*, 849 F.2d at 543. The defendant in *Kolter* did not fit within the class as defined by this new law. The Eleventh Circuit held that the Saving Statute did not prevent the retroactive application of the new definition because Congress did not repeal a statute - as required to trigger the Saving Statute - but simply reflected its disagreement with an interpretation of a federal statute by the Supreme Court. *Id.*; *see also* § 109 (emphasis added) ("The repeal of any *statute* shall not have the effect to release or extinguish . . . . ). Thus, the *Dickerson* definition of "convicted felon" was not saved by § 109, and the defendant was entitled to the retroactive application of the new definition.

7

*Kolter*, 849 F.2d at 544. Moreover, the redefinition "did not affect the punishment provided but merely altered the class of persons for whom the specified conduct is prohibited." *Id.*

The circumstances in the case at bar are distinguishable from *Kolter*. The FSA did not redefine "serious" or "major" traffickers; these terms do not even appear in the original or in the amended statute. In *Kolter*, the conduct at issue - possession of a firearm - was proscribed only for a certain class of individual. The statutory change only affected those persons who fell within that class. The conduct at issue in Reddick's case (i.e., the possession of illegal drugs) is wholly proscribed for all individuals. In the FSA, Congress expressly changed the penalties that are applicable to certain conduct - not to certain classes of people. *See United States v. Bell*, 624 F.3d 803, 814-15 (distinguishing *Kolter* and rejecting argument that FSA effected a similar "redefinition"); *United States v. Wilks*, No. 10-CR-30134, 2011 WL 499949, at *3 (S.D. Ill. Feb. 4, 2011) (citation omitted) ("[T]he FSA expressly amends a punishment portion of § 844(a) by striking the sentence that mandated a minimum five-year prison term. It does not redefine a term."). Thus, Reddick's argument that the Saving Statute does not apply because the FSA did not release a penalty is without merit.

### B.

Reddick's second argument - to wit, that the Saving Statute does not apply because the FSA only produced a remedial or procedural change - is foreclosed by Supreme Court precedent. In *Marrero*, 417 U.S. at 661, the Supreme Court noted that "the general saving clause does not ordinarily preserve discarded remedies or procedures." However, the Court also expressly distinguished punishment - which is subject to the Saving Statute - from remedy and procedure, finding that a provision providing for the non-eligibility of a candidate for parole was such a

8

punishment that the Saving Statute saved it in the face of a later repeal of the legislative provision that mandated it. Likewise, the FSA expressly alters a punishment. *See, e.g.*, *United States v. Doggins*, No. 09-40925, 2011 WL 438935 (5th Cir. Feb. 9, 2011) ("[T]he Fair Sentencing Act imposes a change in sentencing, not a procedural or remedial change."); *United States v. Smith*, No. 10-1266, 2011 WL 285056, at *4 (8th Cir. Jan. 31, 2011) (rejecting argument that FSA effected only a remedial or procedural change because "[t]he FSA is a paradigmatic example of a statute intended to ameliorate substantive criminal penalties"); *Santana*, 2011 WL 260744, at *16 ("[T]he reference to 'remedies or procedures' means only that the Saving Statute does not cover situations in which a repealing statute does not affect the 'penalties, forfeitures, or liabilities' imposed by the repealed statute, but rather only alters the procedures whereby substantive rights are adjudicated."); *United States v. Douglas*, No. 09-cr-00202, 2010 WL 4260221 (D. Me. Oct. 27, 2010) (*Marrero* precludes argument that FSA effects a remedial or procedural change not subject to Saving Statute). Thus, Reddick's argument that the FSA affects only remedies or procedures must also be rejected.

## C.

Reddick's third argument (the parties' reasonable expectations demand retroactive application of the FSA ) is similarly unpersuasive. He cites no statutory or case law authority for the proposition that there is an exception to the Saving Statute where the parties have reasonable expectations of retroactivity. To the extent that Reddick's expectations are relevant, it would seem that his expectations as of the date of his offense would control. *See Skowronek v. Brennan*, 896 F.2d 264, 268 and n.7 (7th Cir. 1990) (citation and internal quotation marks omitted) (rejecting argument that parties' expectation of release on parole under new law overrides § 109 because "whatever expectation of parole [defendants] have is a function of the law in effect at the date the offense was

committed"). If it is Reddick's contention that it is the expectations of Congress - as opposed to his own - that matter, this argument seems to be duplicative of his congressional intent argument, which will be taken up next. He also argues that the 100:1 ratio invites a disrespect for the law in the community, as well as a lack of confidence by the general public in the criminal justice system. While, arguably, this may be true - and the documentary evidence provided by Reddick suggests that it is - he has failed to provide any basis for his conclusion that the disrespect generated by the old law creates an exception to the Saving Statute. Hence, this argument must be rejected.

### D.

It is Reddick's fourth contention (Congress intended the FSA to apply retroactively to non-final cases) that is the most persuasive argument, and represents a position that has carried the day in many district courts. *Compare Douglas*, 2010 WL 4260221 (FSA applies to defendants sentenced after its enactment), *and United States v. Gillam*, No. 10-cr-181, 2010 WL 4906283 (W.D. Mich. Dec. 3, 2010) (following *Douglas*), *with Santana*, 2011 WL 260744 (Saving Statute precludes retroactive application of FSA to any defendant whose conduct preceded enactment of FSA); *United States v. Dickey*, No. 3:2009-34, 2011 WL 49585 (W.D. Pa. Jan. 4, 2011) (same).

Every Circuit Court of Appeals, including the Sixth Circuit, that has addressed the FSA retroactivity issue has determined that this statute is not retroactive to those defendants who were sentenced before its enactment. *United States v. Carradine*, 621 F.3d 575 (6th Cir. 2010); *see also United States v. Diaz*, 627 F.3d 930 (2d Cir. 2010); *United States v. Reevey*, No. 10-1812, 2010 WL 5078239 (3d Cir. Dec. 14, 2010); *United States v. Wilson*, No. 10-4160, 2010 WL 4561381 (4th Cir. Nov. 12, 2010) (unpublished); *United States v. Doggins*, No. 09-40925, 2011 WL 438935 (5th Cir. Feb. 9, 2011); *United States v. Bell*, 624 F.3d 803 (7th Cir. 2010); *United States v. Brewer*, 624 F.3d

10

900 (8th Cir. 2010); *United States v. Hall*, No. 09-1-216, 2010 WL 4561363 (9th Cir. Nov. 10, 2010) (unpublished); *United States v. Reed*, No. 10-6049, 2010 WL 5176818 (10th Cir. Dec. 22, 2010) (unpublished); *United States v. Gomes*, 621 F.3d 1343 (11th Cir. 2010). Thus, defendants are not entitled to a sentence modification based on the FSA.

As of this date, only one circuit court has been squarely presented with the issue relating to the applicability of the FSA to a defendant whose offense conduct - but not sentencing - occurred prior to its enactment. The Second Circuit, in *United States v. Acoff*, No. 10-285-cr, 2011 WL 447043 (2d Cir. Feb. 9, 2011), held that courts are without authority to make the FSA retroactive with respect to any defendant whose offense conduct occurred before the enactment of the FSA, regardless of the date of sentencing. Moreover, the decisions from several of the circuit courts that have dealt with pre-FSA sentencing do not appear to contemplate a distinction among defendants based on their sentencing date. Rather, it is the date of the offense - and not the date of sentencing - that appears to be relevant. *See, e.g.*, *Carradine*, 621 F.3d at 580 ("The new law at issue here, the Fair Sentencing Act of 2010, contains no express statement that it is retroactive nor can we infer any such express intent from its plain language. Consequently, we must apply the penalty provision in place at the time [the defendant] committed the crime in question."); *Brewer*, 624 F.3d at 909 n.7 ("[T]he Fair Sentencing Act contains no express statement that it is retroactive, and thus the 'general savings statute,' 1 U.S.C. § 109, requires us to apply the penalties in place at the time the crime was committed.); *Gomes*, 621 F.3d at 1346 ("[B]ecause the FSA took effect in August 2010, after appellant committed his crimes, 1 U.S.C. § 109 bars the Act from affecting his punishment.").

Several district courts have also held that there is no meaningful distinction among those defendants whose offense conduct preceded the FSA based on whether they were sentenced before

or after the FSA. *E.g.*, *Wilks*, 2011 WL 499949, at *2 (citation and internal quotation marks omitted) ("The fact that defendant's case is pending does not truly distinguish *Bell*. The determinative time period concerning the saving statute is at the time of the commission of the offense."); *Santana*, 2011 WL 260744, at *10 ("[U]nder § 109, there is no basis to parse application of a new statute retroactively, that is, to individuals already sentenced under the old law, as distinct from applying it retrospectively, that is, to individuals yet to be sentenced as of the enactment of the new law but whose criminal conduct pre-dates the new law. Instead, under the plain language of § 109, unless Congress expressly provides otherwise in the new law, the Saving Statute means that an offender whose conduct pre-dates the new law is to be prosecuted and sentenced under the old law."); *United States v. Patterson*, No. 10 Cr. 94, 2010 WL 5480838, at *2 (S.D.N.Y. Dec. 30, 2010) ("This rather finespun distinction between two aspects of retroactivity finds no support in any pre-FSA case law."); *United States v. Holmes*, No. 3:10CR110, 2010 WL 4961657, at *2 (E.D. Va. Dec. 1, 2010) ("Under the circumstances, this is a distinction without a difference.").

Nevertheless, several district courts have determined that § 109 does not bar the retroactive application of the FSA in these circumstances. These courts have relied on language in *Great Northern Railway Co. v. United States*, 208 U.S. 452, 465 (1908), in which the Supreme Court stated that the Saving Statute "cannot justify a disregard of the will of Congress as manifested either expressly or by necessary implication in a subsequent enactment." Expanding on this, the Court held that:

> [The Saving Statute is] to be treated as if incorporated in and as a part of subsequent enactments, and therefore under the general principles of construction requiring, if possible, that effect be given to all the parts of a law, the section must be enforced unless, either by express declaration or necessary implication, arising from the terms

12

of the law as a whole, it results that the legislative mind will be set at naught by giving effect to the provisions of [the Saving Statute].

*Id.* Thus, even absent express provision for retroactivity in the FSA, the Saving Statute would not apply if, when reading the FSA as a whole, the necessary implication is that Congress did not so intend.

Those courts which have determined that the FSA does apply in these circumstances have found several factors to be indicative of congressional intent. First, and most persuasively, they point to the directive in the FSA that the Sentencing Commission amend the Sentencing Guidelines within ninety days so that they would "achieve consistency with other guideline provisions and applicable law." FSA § 8(1)-(2). The Commission made the relevant changes, effective on November 1, 2010. Temporary Emergency Amendment to Sentencing Guidelines and Commentary, 75 Fed. Reg. 66,188, 66,191 (Oct. 27, 2010) ("[T]he relationship between the statutory penalties for crack cocaine offenses and the statutory penalties for offenses involving other drugs is consistently and proportionally reflected throughout the Drug Quantity Table."). Under the Sentencing Reform Act of 1984, the Guidelines in effect on the date of sentencing govern. 18 U.S.C. § 3553(a)(4)(A)(ii). Thus, the amended Guidelines apply to all defendants who are sentenced after November 1, 2010, without regard to when the criminal conduct occurred. These courts have deemed the simultaneous application of the old statute and the new Guidelines to be contrary to the stated congressional goal of achieving consistency between the law and the Guidelines. *E.g.*, *Douglas*, 2010 WL 4260221, at *5 ("It would be a strange definition of 'conforming' and 'consistency' to have these new amended Guidelines go into effect while the old and therefore inconsistent statutory minimums continue."); *United States v. Cox*, No. 10-cr-85, 2011 WL 92071, at *23 (W.D. Wis. Jan. 11, 2011) ("The

13

urgency to amend the sentencing guidelines 'as soon as practicable' is consistent with the FSA's larger goal of 'restor[ing] fairness to federal cocaine sentencing.'"); *United States v. Holland*, 8:10CR48, 2011 WL 98313, at *9 (D. Neb. Jan. 10, 2011) ("The grant of emergency amendment authority to the Commission shows that Congress intended and expected that the new crack penalties would be applied as soon as possible."); *United States v. English*, No. 3:10-CR-53, 2010 WL 5397288, at *3 (S.D. Iowa Dec. 30, 2010) ("[If the FSA is not retroactive], a court would be in the absurd position of applying guidelines amended to ensure 'consistency with applicable law' to situations in which that very 'applicable law' was not applicable.").

Second, these courts have pointed to the presence of the word "fair" in the title of the Act and to the preamble of the FSA, which provides that the purpose of the law is to "restore fairness to Federal cocaine sentencing," FSA pmbl. Continued imposition of the old mandatory minimum sentences is deemed fundamentally incompatible with this stated goal. "[W]hat possible reason could there be to want judges to continue to impose new sentences that are not 'fair' over the next five years while the statute of limitations runs?" *Douglas*, 2010 WL 4260221, at *5; *see also United States v. Elder*, No. 1:10-CR-132, 2011 WL 294507, at *6 (N.D. Ga. Jan. 27, 2011) ("For the Court to continue to impose sentences that are contrary to the statute that Congress itself described as 'An Act to restore fairness to Federal cocaine sentencing' would be an absurd result.").

Third, these courts, having considered the legislative history surrounding the passage of the FSA, have recited a litany of powerful expressions of the intent by some legislators who voiced their belief that courts should immediately cease applying the old 100:1 ratio because the underlying rationales for it had proven to be inappropriate. *See, e.g.*, *Holland*, 2011 WL 98313, at *4 (collecting congressional statements demonstrating that "Fair Sentencing Act was enacted because it had

14

become clear that there was no evidentiary basis for the 100-to-1 crack/powder ratio and to remedy the racially discriminatory impact of the ratio"); *Cox*, 2011 WL 92071, at *2 ("But it is no great stretch to find Congress's statements about the urgent need to remedy an unfair sentencing scheme between powder and crack cocaine offenses as a sufficient expression of intent to apply the FSA to those offenders who both enter a plea and are sentenced after its enactment."). The lead sponsors of the FSA, Senators Durbin and Leahy, wrote a letter to Attorney General Eric Holder[2] in which they urged him to "apply [the FSA's] modified mandatory minimums to all defendants who have not yet been sentenced, including those whose conduct predates the legislation's enactment." Letter from Sens. Richard Durbin and Patrick Leahy to Att'y Gen. of the U.S. (Nov. 17, 2010), attached as Ex. 1 to Def.'s Br.

These factors when taken together, according to these courts, create the "necessary implication" that Congress intended the FSA to apply to all defendants who are sentenced after its enactment. *E.g.*, *United States v. Robinson*, No. 1:10-CR-66, 2011 WL 379536, at *5 (E.D. Tenn. Feb. 4, 2011) ("The context in which the Act was passed, its preamble, and most importantly its 'emergency' mandate that the Guidelines be amended to achieve consistency with applicable law,

---

[2]Attorney General Holder has stated that it is "the view of this Administration that the 100-to-1 crack-powder sentencing ratio is simply wrong. It is plainly unjust to hand down wildly disparate prison sentences for materially similar crimes. It is unjust to have a sentencing disparity that disproportionately and illogically affects some racial groups," and that "[t]here is no law enforcement or sentencing rationale for the current disparity between crack and cocaine powder offenses, and I have strongly supported eliminating it to ensure our sentencing laws are tough, predictable and fair." *See Holland*, 2011 WL 98313, at *5. These remarks notwithstanding, it is the position of Department of Justice that the FSA does not apply retroactively, even to those defendants sentenced after its enactment. *But see id.* at *12 ("The DOJ has publicly acknowledged that the pre-FSA penalties for crack cocaine are overly harsh, discriminatory, and unfair. To now call for their continued application is inconsistent at best and hypocritical at worst.").

that is, with the FSA, give rise by necessary implication to the conclusion Congress intended the FSA to apply to all offenders sentenced after its enactment."); *Holland*, 2011 WL 98313, at *11 ("Based upon the language and structure, legislative history, and motivating policies of the Fair Sentencing Act and the Sentencing Reform Act of 1984, the court finds Congress did not want federal judges to continue to impose harsher sentences after the enactment of the FSA merely because the criminal conduct occurred before the enactment."); *Douglas*, 2010 WL 4260221, at *6 ("I conclude, based upon the context of the Act, its title, its preamble, the emergency authority afforded to the Commission, and the Sentencing Reform Act of 1984, that Congress did not want federal judges to continue to impose harsher mandatory sentences after enactment merely because the criminal conduct occurred before enactment.").

Notwithstanding these arguments, the Court concludes that it is restricted by Sixth Circuit precedent from applying the FSA to Reddick's sentence. In *Carradine*, the Sixth Circuit held that the FSA is not retroactive and thus did not apply to a defendant whose case was pending on appeal when it was enacted. 621 F.3d at 580. District courts within the Sixth Circuit have come to different conclusions regarding the binding effect of *Carradine* in the circumstances presented here. *Compare Robinson*, 2011 WL 379536, at *6 ("[T]he Court concludes neither the Sixth Circuit's holding in *Carradine* nor any premises necessary to such holding preclude this Court from applying the new mandatory minimum thresholds established by the FSA to all defendants sentenced after August 3, 2010."), *United States v. Jones*, No. 10-cr-00233, at 3 (N.D. Ohio Jan. 3, 2011), ECF No. 21 ("The Sixth Circuit had a much different factual scenario at the time of the decision in *Carradine*. . . . This Court elects to follow the decisions of Judge Hornby [in *Douglas*] and Judge Neff [in *Gillam*] in the belief that their well-reasoned opinions should be followed by this Court."), *and Gillam*, 2010 WL

16

4906283 (following *Douglas*), *with United States v. Franklin*, No. 10-20467, 2011 WL 346085 (E.D. Mich. Feb. 3, 2011) ("[E]ven though defendants have presented a good faith argument that the FSA should apply because they have not yet been convicted or sentenced, the Court is bound by Sixth Circuit precedent [*Carradine*] requiring application of the guidelines in place at the time the offenses occurred.").

The language of *Carradine* does not permit a distinction to be drawn among defendants based on the date of sentencing. *Carradine*, 621 F.3d at 580 ("[The FSA c]ontains no express statement that it is retroactive nor can we infer any such express intent from its plain language. Consequently, we must apply the penalty provision in place at the time Carradine committed the crime in question."). Moreover, *Carradine* is more factually similar to the scenario in this case than some of the above-cited circuit court decisions. In *Carradine*, the defendant's case was not final when the FSA was enacted into law, as it was before the Sixth Circuit on the defendant's appeal from his sentence. The Sixth Circuit has again held (in an unpublished opinion) that *Carradine* dictates that the FSA does not apply to defendants whose cases were still pending on appeal when it was enacted. *United States v. Johnson*, No. 09-2173, 2010 WL 5395725, at *3 n.1 (6th Cir. Dec. 28, 2010) (quoting *Carradine*, 621 F.3d at 580) ("The [FSA] does not apply retroactively, and a panel of this court has held that 'we must apply the penalty provision in place at the time [that Johnson] committed the crime.'"). Conversely, in many of the other circuit court cases, the defendant sought to obtain a re-sentencing pursuant to the FSA even though his case was finalized before its enactment. Thus, unless and until the Sixth Circuit modifies its holding in *Carradine*, this Court is obligated to sentence all defendants whose conduct preceded the enactment of the FSA in accordance with the law as it existed on the date of the offense.

The Court is not aware of any situation in which the Saving Statute was applied differently to defendants whose criminal conduct predated the enactment of a repealing statute based on whether they had been sentenced by that date. *See Patterson*, 2010 WL 5480838, at *2 ("This rather finespun distinction between two aspects of retroactivity finds no support in any pre-FSA case law."); *see also Holmes*, 2010 WL 4961657, at *2 ("[N]one of the cases refusing to retroactively apply the FSA hinged upon the fact that the defendants were seeking post-sentencing relief. Rather, the courts correctly based their decisions on the fact that the FSA contains no intimation that its ameliorative penalty provisions override the penalty provisions in place at the time of offense."). Yet what Reddick seeks here is that the Court draw an even finer distinction among those defendants whose cases were not final on August 3, 2010, arguing that the FSA (1) is not retroactive with respect to any defendants whose cases were on appeal, but (2) is retroactive with respect to the defendants who had not been sentenced when it was enacted into law. Without addressing the merits, if any, of drawing a distinction between final and non-final cases, the Court cannot find any basis in the statute or in relevant case law to draw a distinction between non-final pre-sentencing cases and non-final post-sentencing cases that remain on appeal.

Even if the Court was not bound by *Carradine*, the outcome in the case *sub judice* would be the same. The evidence that has been proffered by Reddick does not create the "necessary implication" that Congress did not intend for the Saving Statute to apply to that sub-category of pre-FSA cases wherein the sentencing occurs post-FSA. The fact that Congress directed the immediate modification of the Sentencing Guidelines to reflect the statutory changes does not prove or establish that it also intended the FSA to be applied to all sentences in the future:

> [I]t is one thing to direct, as the FSA does, that the Sentencing Guidelines, which are now discretionary, be promptly conformed and applied to a new regime, and quite something else to infer from this that Congress necessarily intended that mandatory minimums, which are legislative dictates, be reduced retroactively in sentences following the date of the new enactment, notwithstanding the presumption of the Savings Statute. This Court concludes that nothing in the language of the FSA even hints at, let alone necessitates, the latter inference.

*Patterson*, 2010 WL 5480838, at *2. Furthermore, it would not be irrational for Congress to want the new provisions to be reflected immediately in the Guidelines but, at the same time, *not* want the lower mandatory minimums to apply to those defendants whose offense conduct pre-dated the FSA. *See Acoff*, 2011 WL 447043, at *1 ("It is not irrational for Congress to impose a penalty on those who committed their offenses at a time when they knew or should have known the severity of the applicable penalty, even while reducing the penalty as to future offenders."); *Santana*, 2011 WL 260744, at *18 (citation and internal quotation marks omitted) ("Indeed, it seems perfectly rational for Congress to have wanted the Guidelines to correlate to the changes wrought by the FSA for defendants to be sentenced under the [its] new mandatory minimums, but that is not the same as requiring that all defendants be sentenced pursuant to the . . . lower mandatory minimums [under the Act] for conduct that pre-dates [its enactment]. Such an outcome, by which . . . the [resulting] sentences are a function of when the sentencing occurs, is hardly a *necessary* implication of the FSA's terms nor does it logically follow from its structure.").

Moreover, it strikes the Court as being unreasonable to assume that Congress intended to signal its intent that the FSA be retroactive not by expressly so stating in the legislation itself, but rather by undertaking the circuitous route of granting emergency authority to update the advisory Sentencing Guidelines. *See Dickey*, 2011 WL 49585, at *8 ("Congress could have easily signaled, with the insertion of a single sentence, its intention that the general saving clause should not apply

to the FSA, if indeed that was its intention. Congress is aware of the history of the general saving clause, and to assume this convoluted construction, that Congress intended its direction to the Sentencing Commission to negate the general saving clause, is an exercise in speculation not within this Court's purvue."). If Congress intended retroactivity, it seems manifestly improbable that, through its silence in the legislation, it would have compelled aggrieved litigants to seek and only inconsistently find some relief through judicial pronouncements.

To the extent that Reddick supports the view that a retroactive application will more fully vindicate the ameliorative and fairness purposes elucidated in the title and preamble of the FSA, this argument must also be rejected. It is not for the Court to determine how to effectuate the intent of the legislators in Washington more fully than Congress itself saw fit. In 1994, the Supreme Court opined that "[i]t will frequently be true . . . that retroactive application of a new statute would vindicate its purpose more fully. That consideration, however, is not sufficient to rebut the presumption against retroactivity." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 285 (1994); *see also Santana*, 2011 WL 260744, at *22 ("To the extent some in Congress felt strongly that the sentencing regime created by the 1986 Act was unfair, and fostered a perception that it was unfair, and that not another sentence under the old law should be imposed, all they had to do was persuade a majority in Congress to expressly provide in the FSA that no sentences under the 1986 Act should be imposed from the day [it] was enacted.").

Reddick's argument regarding legislative history is even less persuasive. Although the expressions of congressional intent are powerful, the Court is without authority to consider them. *See Wilks*, 2011 WL 499949, at *3 ("Regarding the legislative history, the Court declines to second-guess the plain language of the saving statute. If the text of a statute is plain and

unambiguous, courts must apply the statute according to its terms."); *Dickey*, 2011 WL 49585, at *6 ("[The court] will decline to glean additional authority from the unadopted comments of individual congressmen, or from the subjective 'tone' [that the defendant] suggests pervades the [FSA]. Neither of these things supersede the plain language of the [FSA's] text, nor should they be utilized in invalidating the applicability of the saving clause.").

Moreover, the Court notes that the most powerful expression of congressional intent possible is contained in the language of the FSA. *See Wilks*, 2011 WL 499949, at *3 (citation and internal quotation marks omitted) ("The legislative intent referred to in *Great Northern Railway* is that intent expressed in the terms of the law as a whole,' not legislative history. The Court finds that the terms of the saving clause are clear . . . .); *United States v. Crews*, No. 06-418, 2010 WL 5178017, at *4 n.5 (W.D. Pa. Dec. 20, 2010) (citations and internal quotation marks omitted) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete."). As Reddick concedes, and as every court that has reviewed the FSA has noted, this statute does not contain any express retroactivity provision. While some members of Congress plainly argued that the FSA should be applied immediately, it is evident that no such provision found its way into the final version of the bill. *See Patterson*, 2010 WL 5480838, at *3 ("[T]he legislative history of the FSA demonstrates that Congress was acutely aware of retroactivity issues as it considered the measure - even considering making the entire measure retroactive - but chose in the end to insert no language expressly addressing retroactivity, thus leaving the Savings Statute as the default position."); *Dickey*, 2011 WL 49585, at *3 ("[T]he attempt to search for legislative intent from selected statements of individual congressmen who were

21

sponsors of the law disregards the constitutional primacy of the text of a statute, and divines a purpose never adopted by the whole of Congress."). In light of the foregoing, the Court concludes that no exception to the Saving Statute applies to the FSA, and thus its default non-retroactivity provision applies.

## IV.

Finally, Reddick urges the Court to construe the Saving Statute and the FSA in such a way as to avoid serious constitutional questions. He argues that an application of the 100:1 ratio by the Court would be "unjust, fundamentally unfair, and a denial of equal protection . . . now that the Fair Sentencing Act has been enacted." (Def.'s Sentencing Memo. At 22-23). Yet Reddick does not articulate how a ratio - however wrong-minded it may be - that has been repeatedly upheld against constitutional challenges, *see United States v. Berry*, 290 Fed. App'x 784, 793 (6th Cir. 2005) ("We have consistently held that the crack/powder disparity withstands constitutional scrutiny, including challenges based on due process, equal protection, and the Eighth Amendment."), is unconstitutional now that a new law has been enacted, *see United States v. Smith*, No. 10-1266, 2011 WL 285056, at *4 (8th Cir. Jan. 31, 2011) ("[T]here are no serious constitutional issues raised by the question whether § 109 applies to the FSA."); *Santana*, 2011 WL 260744, at *24 ("If the binding authority before the FSA's enactment was that there was no constitutional violation from the 100-to-1 ratio, the Court is at a loss to see how Congress' decision to lower that ratio, but to do so only prospectively, yields a different conclusion.").

Moreover, the constitutional avoidance canon is only implicated where the challenged statute is ambiguous and open to two plausible interpretations, one that is constitutional and one that is unconstitutional. *Clark v. Martinez*, 543 U.S. 371, 381 (2005). However, as the foregoing analysis

demonstrates, and in light of binding Sixth Circuit precedent, the FSA is simply not ambiguous with respect to the issue of retroactivity. *Santana*, 2011 WL 260744, at *23 (citation omitted) ("Defendants attempt to couch this omission as the type of ambiguity that triggers use of these statutory construction canons. But, in the context of the Saving Statute, such ambiguity does not invite application of rules of construction. If there is ambiguity about a repealing statute's retroactive reach, then the Saving Statute provides that the law at the time of offense governs. "). Therefore, Reddick's constitutional avoidance argument is unavailing.

## V.

The Court joins those other courts that have expressed their extreme discomfort with continuing to apply the provisions of the 1986 Act which were (1) premised on faulty underlying assumptions, and (2) determined to be unfair and cause a discriminatory racial impact upon society. *See Acoff*, 2011 WL 447043, at *2 (Calabresi, J., concurring) (despite determination that FSA does not apply to any pre-FSA conduct, "there is something troubling about this result with regard to a statute whose grossly different treatment of chemically identical drugs - the rock and powder forms of cocaine - has been criticized and questioned, particularly on grounds of racial injustice"); *id.* at *3-4 (Lynch, J., concurring) ("This result is consistent with the Constitution, and - short of adopting a novel theory of constitutional adjudication - courts have no power to alter it. . . . [but] Congress would do well to quickly and seriously consider whether it has inadvertently required courts to continue an unjust practice in a small but significant number of on-going cases."); *Douglas*, 2010 WL 4260221, at *6 n.57 ("I would find it gravely disquieting to apply hereafter a sentencing penalty that Congress has declared to be unfair."). Nevertheless, the Court reluctantly concludes that it is without authority to render a different result.

VI.

Finally, Reddick urges the Court to determine that he is eligible for the statutory "safety valve," 18 U.S.C. § 3553(f); U.S.S.G. § 2D1.1(b)(11), in which case the mandatory minimum sentence would not apply. The parties agree that Reddick has satisfied the first four criteria. However, the Government asserts that he did not satisfy the last criterion which, in essence, requires him to "truthfully [provide] the Government [with] all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f)(5). "The defendant bears the burden of proving by a preponderance of the evidence that he or she is entitled to a safety valve reduction." *United States v. Haynes*, 468 F.3d 422, 427 (6th Cir. 2006). Eligibility for the reduction requires more than simple acceptance of responsibility. Rather, this provision requires a defendant - such as Reddick - "to reveal a broader scope of information about the relevant criminal conduct to the authorities." *United States v. O'Dell*, 247 F.3d 655, 675 (6th Cir. 2001) (citation and internal quotation marks omitted). "These stringent requirements reflect the fact that the safety valve was intended to benefit only those defendants who truly cooperate." *Id.* (citation and internal quotation marks omitted). However, "the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement." 18 U.S.C. § 3553(f).

Although Reddick identified the person who had allegedly orchestrated the drug sales - an individual who had by that time died - he was unable or unwilling to name any person who could corroborate this information. The Government, in support of its position that Reddick was not truthful during his debriefing sessions with federal agents, asserts that (1) the cellular telephone

24

number provided by Reddick for this "culpable" individual did not match the number that its confidential informant had used to arrange the illicit drug transaction in February 2009; and (2) the confidential informant stated that the person with whom he had met to arrange the February 2009 illicit drug transaction was not the individual who was identified by Reddick. Reddick provided the Court with alternative scenarios that, if true, could explain these discrepancies. However, the simple provision of a possible or even a plausible explanation is insufficient to meet his burden. Moreover, his claimed inability to name a single person who could corroborate his assertions about the named individual strikes the Court as not credible. Therefore, the Court concludes that Reddick has not met his burden of demonstrating that he provided the Government all relevant information.

VII.

Having addressed and resolved the contested legal issues, the Court now directs the parties to appear for a sentencing hearing on Monday, March 7, 2011, at 1:30 p.m.

IT IS SO ORDERED.

Dated:  February 28, 2011                        s/Julian Abele Cook, Jr.
        Detroit, Michigan                        JULIAN ABELE COOK, JR.
                                                 United States District Court Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on February 28, 2011.

s/ Kay Doaks
Case Manager